**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:18-cv-271

DEPUY SYNTHES SALES, INC., a Massachusetts corporation,

       Plaintiff,

v.

DAVID ANTON MAJHER, an individual,
JAMES SPELTS, an individual,
MADDISON HUTCHINGS, an individual,
and SEASPINE, INC., a West Virginia corporation,

       Defendants.

---

**VERIFIED COMPLAINT AND JURY DEMAND**

---

      Plaintiff DePuy Synthes Sales, Inc. ("Plaintiff" or "DePuy Synthes") files this Verified Complaint against Defendants David Anton Majher ("Majher"), James Spelts ("Spelts"), Maddison Hutchings ("Hutchings"), and SeaSpine, Inc. ("SeaSpine") (collectively, "Defendants"), and in support thereof avers as follows:

## INTRODUCTION

      1.    This case involves a coordinated, unlawful effort by former DePuy Synthes Spine Sales Consultants, Majher and Spelts, and Associate Sales Consultant, Hutchings (collectively, the "Sales Consultants"), to market, sell and distribute competing spine products manufactured by DePuy Synthes' direct competitor, SeaSpine, in violation of their contractual and common law obligations to DePuy Synthes with SeaSpine's  knowledge and direct assistance.

      2.    DePuy Synthes is a worldwide leader in the design, manufacture, and sale of medical devices, including instrumentation and implants used in orthopedic and other surgeries.

3.      The Sales Consultants worked on behalf of DePuy Synthes' Spine division, which specializes in the design, manufacture, marketing, and sale of instrumentation and implants used in spinal surgeries.  From April 2016 until their coordinated resignations in September 2017, Majher and Spelts worked as a team, selling spine products to and serving DePuy Synthes' customers in and around the Northern Denver, Colorado area.  In these roles, Majher and Spelts were responsible for selling DePuy Synthes' products to various healthcare providers in this geographic area, including large hospital accounts, and for maintaining and developing key relationships with the physicians and personnel who play a critical role in determining the implants and instrumentation used in surgeries.

4.      Hutchings, who provided support to DePuy Synthes through her employer, Quintiles Commercial US, Inc. ("Quintiles"), was responsible for providing coverage and support for sales consultants responsible for the sale of DePuy Synthes' Spine products to accounts in Southern Colorado.  For a five-month period beginning in January 2017, Hutchings provided coverage and support for Majher and Spelts in their accounts in Northern Denver because their former associate sales consultant had recently resigned.

5.      In their respective roles, the Sales Consultants regularly received, accessed, and possessed confidential, proprietary, and trade secret information of DePuy Synthes related to the business in the Colfax Corridor territory, the disclosure of which would cause irreparable harm to DePuy Synthes.  This information includes detailed information about the DePuy Synthes' pricing, marketing, and sales strategies, product performance information, new product introduction plans, business plans, expansion plans, specialty pricing arrangements and incentives with particular customers, technology and product development research, product pipelines and release schedules, competitive responses, periodic and year-end sales data and

reports, performance rankings, sales by pathology and product line, and customer or GPO-specific pricing and discounts, account and IDN-level strategy, economic value adds and financial models, standardization plans, as well as information related to DePuy Synthes' research and development plans and strategy and sensitive discussions between DePuy Synthes and DePuy Synthes' customers related to the development and rollout of new products.  In the days, weeks, and months leading up to their coordinated resignations, the Sales Consultants emailed highly confidential, proprietary, and trade secret information to their personal email accounts, including, without limitation, specific pricing information for customers in their territory, purchasing information, regional business strategies, as well as detailed sales data for the Colfax Corridor territory.  The Sales Consultants have failed to return this information to DePuy Synthes, in direct violation of their express obligation to do so under their Agreements.

6.      Hutchings resigned from Quintiles to accept a position at SeaSpine on or about September 8, 2017.  Within days of her resignation, Majher and Spelts collectively resigned from DePuy Synthes, effective immediately, failing to provide two weeks' notice or any specific information concerning their post-employment plans.  Since their departure from DePuy Synthes, Majher and Spelts have formed an independent distributorship distributing spinal medical devices, and possibly other competitive products, in Colorado and surrounding states, including, upon information and belief, SeaSpine products.

7.      After providing verbal notice of their resignations, DePuy Synthes instructed Majher and Spelts not to go into their accounts before their departure from DePuy Synthes.  Upon information and belief, Majher and Spelts ignored this directive and contacted their DePuy Synthes' customers while they were still employed to inform them of their resignations from DePuy Synthes.

8.      Since their departure from DePuy Synthes, Majher and Spelts have been in contact with former customers in their team territory—including customers that Hutchings has been in contact with and covered surgical cases for and, upon information and belief, customers that Hutchings has converted and/or is in the process of converting to SeaSpine.

9.      Since resigning, Hutchings has been working on behalf of SeaSpine in the same accounts that she covered for Majher and Spelts while she was providing support to DePuy Synthes and business at these accounts has converted from DePuy Synthes to SeaSpine, including cases with at least two surgeons at the University of Colorado Hospital and VA Medical Center—accounts that she covered in Majher's and Spelts's team territory and about which she has confidential and proprietary information.

10.      Prior to their coordinated resignations, SeaSpine had a very limited presence in the Denver market and, upon information and belief, did not have any business in the accounts that Hutchings is now providing services to on behalf of SeaSpine and where DePuy Synthes' business has converted to SeaSpine.

11.      In light of her role as an associate sales consultant on behalf of DePuy Synthes, it is highly unlikely that Hutchings would have been able to immediately convert DePuy Synthes' business in Majher and Spelts's territory without assistance from Majher and Spelts. Accordingly, upon information and belief, since their resignations from DePuy Synthes, Majher and Spelts have worked behind the scenes to facilitate the conversion of DePuy Synthes' valuable customer relationships, goodwill, specialized training, trade secrets, and confidential information for the benefit of themselves and for SeaSpine in violation of their contractual and common law obligations to DePuy Synthes.

12.     For its part, SeaSpine has, at all material times, known about and intentionally interfered with the contractual obligations the Sales Consultants owed and continue to owe to DePuy Synthes, including by, among other things, employing Hutchings in a capacity where she is soliciting DePuy Synthes customers for whom she had coverage responsibility during her work on behalf of DePuy Synthes in violation of her obligations.

13.     Defendants' conduct has inflicted and will continue to inflict significant and irreparable harm on DePuy Synthes, and that harm cannot be fully measured and calculated or compensated through monetary damages alone.  Consequently, DePuy Synthes now files this Verified Complaint to remedy the harms caused by the Defendants' unlawful competitive activities through, among other remedies, an award of damages, attorney's fees and costs, and interim and permanent equitable relief, including preliminary injunctive relief to enjoin the Sales Consultants' compliance with their contractual and common law obligations to DePuy Synthes and restore the *status quo*—that is, the status before the Defendants' violations of and interference with the Sales Consultants' contractual and common law obligations to DePuy Synthes.

14.     DePuy Synthes attempted to resolve this matter without Court intervention by seeking assurances from Defendants that the Sales Consultants would comply with their obligations to DePuy Synthes.  However, in response, Majher and Spelts provided vague and generalized assurances that they were complying and would continue to comply with their post-employment obligations to DePuy Synthes—assurances that DePuy Synthes has come to learn were not true.  Hutchings and SeaSpine, on the other hand, through SeaSpine's counsel, refused to acknowledge the reasonable restrictions in Hutchings's Agreement and took the position that she was permitted to go directly into the accounts that she provided direct coverage for in the

Colfax Corridor territory.  These exchanges with Hutchings's and SeaSpine's counsel took place into late October 2017, around the time that DePuy Synthes first received a report that Hutchings was seen in one of her former coverage accounts.  In the weeks following these exchanges, DePuy Synthes received reports that Hutchings was indeed covering cases in her former coverage accounts and continues to do so to this day.  DePuy Synthes has also come to learn that in the weeks and months leading up their resignations, the Sales Consultants emailed DePuy Synthes confidential information to their personal emails, information which is likely still in their possession and could be used to DePuy Synthes severe detriment.

15.     Because Defendants have refused to abide by the Sales Consultants' contractual and common law obligations, this lawsuit and DePuy Synthes' request for preliminary injunctive relief has become necessary.

## PARTIES

16.     DePuy Synthes Sales, Inc. is a Massachusetts corporation with a principal place of business in Massachusetts. It is a wholly-owned subsidiary of Synthes, Inc., which is a wholly owned subsidiary of DePuy Synthes, Inc., which, in turn, is a wholly-owned subsidiary of Johnson & Johnson International, a subsidiary of Johnson & Johnson.  Johnson & Johnson—DePuy Synthes' parent company—is a New Jersey corporation with its principal place of business and United States and international headquarters in New Brunswick, New Jersey.  All of these entities are within the Johnson & Johnson Family of Companies.

17.     Upon information and belief, Defendant David Anton Majher resides at 4750 Cherry Creek Drive South, Unit E100, Glendale, CO 80246 and is domiciled in and, thus, a citizen of Colorado.

18.     Upon information and belief, Defendant James Spelts resides at 8481 East 54th Drive, Denver, CO  80238 and is domiciled in and, thus, a citizen of Colorado.

6

19.     Upon information and belief, Defendant Maddison Hutchings resides at 11542 Belle Meade Drive, Conifer, CO  80433 and is domiciled in and, thus, a citizen of Colorado. Hutchings is currently employed by SeaSpine.

20.     Defendant SeaSpine, Inc. is a West Virginia corporation with its principal place of business at 5770 Armada Drive, Carlsbad, California 92008.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties.  DePuy Synthes is a citizen of a different state from any of the Defendants, and the amount in controversy, to the extent measured and calculable by monetary damages, exceeds the sum or value of $75,000, exclusive of interest and costs.

22.     This Court has personal jurisdiction over the Defendants.  The Sales Consultants are each citizens of the State of Colorado and reside in this judicial district. SeaSpine regularly conducts business in Colorado and its tortious conduct in interfering with the Sales Consultants' contractual obligations has occurred within this judicial district.

23.     Venue and is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to DePuy Synthes' claims occurred in this judicial district.

## FACTS SUPPORTING VERIFIED COMPLAINT

### DePuy Synthes Is a Leader in the Highly Competitive Medical Device Industry

24.     DePuy Synthes is a worldwide leader in the highly competitive medical device industry and designs, manufactures, markets, and sells medical implants and instrumentation

such as plates, screws, rods, and other devices used in orthopedic surgeries for internal fixation of broken bones, joint reconstruction and replacement, and for spinal and facial surgery.

25.     The medical device business is highly competitive, and the protection of DePuy Synthes' trade secrets, confidential information, customer relationships, and goodwill is vital to prevent competitors or would-be competitors from obtaining an unfair competitive advantage and from exploiting the investments DePuy Synthes has made in not only research and development but also the formation and development of customer relationships and the recruitment, training, and development of a knowledgeable sales force.

26.     DePuy Synthes markets and sells its products through a sales force that is comprised primarily of sales consultants who are assigned to territories and accounts and, in many instances, work in teams (sometimes with joint responsibility for a shared territory with an equal share of commissions or sometimes under a team lead) and provide coverage and support for customers in neighboring territories assigned to other sales consultants.

27.     To assist the sales consultants in the performance of their responsibilities in the assigned territories, DePuy Synthes also employs the services of associate sales consultants, who are responsible for working at the direction of the sales consultant in the assigned territories. Associate sales consultants are responsible for, among other things, servicing existing customers, managing company assets, sales logistics, and execution of national, regional, and local initiatives using confidential information provided to them by DePuy Synthes.  In addition to working with the sales consultants within their assigned territories, associates sales consultants also provide coverage and support for customers in neighboring territories assigned to other sales consultants.

28.     DePuy Synthes generally pays its sales consultants on a commission basis, along with sales growth incentives and bonuses.  Associate sales consultants are salaried positions; however, associate sales consultants also typically receive some form of commission payment on the sales that they support.

29.     Sales consultants and associate sales consultants are expected to inform and educate customers, including the physicians, hospitals, and operating room staff, on the safe and effective use of DePuy Synthes' products.  Accordingly, the confidential education and training program that DePuy Synthes provides these sales consultants and associate sales consultants as well as DePuy Synthes' relationships with customers—relationships that are cultivated with the resources and support of DePuy Synthes—are among the key factors necessary to maintain and develop DePuy Synthes' business.

30.     DePuy Synthes' customers include any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences, or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts, or persons such as, without limitation, group purchasing organizations or integrated delivery networks, health systems, hospitals and surgery centers and their materials management, operating room, sterile processing, purchasing, and related personnel, and physicians and their partners, employees, and staff nurses.

31.     DePuy Synthes invests significant time, effort, and money to develop its trade secrets, confidential information, training programs, customer relationships, and related goodwill.  To protect its investment, DePuy Synthes requires all sales employees to sign non-competition, non-solicitation, and non-disclosure agreements, such as the Agreements here, which contain obligations, subject to reasonable temporal limitations, that protect against the use

or disclosure of confidential, proprietary, and trade secret information (defined to cover, among other things, sales and marketing strategies, distribution details, business planning and development, financial information, pricing, sales volume or strategies, and purchasing histories), competition in their former sales territories or in other locations that could result in the disclosure of DePuy Synthes confidential and trade secret information, the solicitation and servicing of DePuy Synthes' customers, the solicitation of DePuy Synthes' employees to leave their employment, disloyalty during employment, and the efficient transition of responsibilities in the event of a termination.

32.     In exchange for executing these Agreements, DePuy Synthes promises to provide and does provide its employees with access to its valuable confidential and trade secret information, training programs, access to customer relationships, and related goodwill in which DePuy Synthes has invested significant time, effort, and money.

### DePuy Synthes' Relationship with Quintiles

33.     DePuy Synthes has contracted with Quintiles to provide DePuy Synthes with field sales consultant services to support DePuy Synthes' business.  In 2016, DePuy Synthes engaged 150 people through Quintiles to support DePuy Synthes' sales force, including Hutchings.

34.     Consistent with the role of the DePuy Synthes' associate sales consultant described above, these contracted associate sales consultants primarily provide logistical assistance for DePuy Synthes' sales force and cover cases with existing customer relationships, using DePuy Synthes' confidential information to do so.

35.     Here, Hutchings was engaged to support the entire portfolio of products within the DePuy Synthes Spine franchise.

36.     The personnel that are engaged to support DePuy Synthes business through Quintiles, including those engaged as associate sales consultants like Hutchings, are provided

access to trade secrets and confidential information relating to the business of DePuy Synthes, are responsible for maintaining and developing business and/or customer relationships of DePuy Synthes, and receive extensive training relating to the business of DePuy Synthes.

37.     As a result of their access to these valuable assets, these associate sales consultants are required to execute non-disclosure, non-competition, and non-solicitation agreements in connection with their provision of services to DePuy Synthes during their employment with Quintiles.  DePuy Synthes is an express third-party beneficiary to the Quintiles agreements with these consultants and may enforce the provisions of those agreements directly as if DePuy Synthes were a signatory to the agreements itself.

**The Sales Consultants' Employment and Work for DePuy Synthes and Access to and Knowledge of DePuy Synthes' Confidential, Proprietary, and Trade Secret Information**

38.     At all relevant times, the Sales Consultants worked in and/or otherwise represented DePuy Synthes' Spine Division, which specializes in the design, manufacture, marketing, and sale of instrumentation and implants used in spinal surgeries.

39.     Majher began his employment with DePuy Synthes as an associate sales consultant on or about November 10, 2014 with responsibility for accounts in the North Denver, Colorado territory.

40.     Spelts began his employment with DePuy Synthes as an associate sales consultant on or about February 1, 2013 with responsibility for accounts in the Denver, Colorado territory.

41.     Majher and Spelts were subsequently promoted to sales consultants.  In April 2016, Majher and Spelts became a team and were assigned shared responsibility for accounts within the Colfax Corridor territory in Northern Denver, Colorado including, among other hospitals, Denver Health & Hospital Authority, Musculoskeletal Surgical Center, North Suburban Medical Center, Saint Anthony's North Hospital, The Children's Hospital Association,

University of Colorado Hospital, VA Medical Center, Avista, Longmont, Minimally Invasive Spine Inst, Boulder Community, Lutheran, Good Samaritan, and the physicians and staff affiliated with those accounts. As part of their roles as sales consultants, Majher and Spelts also were expected to provide coverage for surgeries in neighboring territories for other sales consultants.

42.     By virtue of Majher's and Spelts's operation as a team with shared responsibility for the Colfax Corridor territory, they had access to trade secrets and confidential and proprietary information related to the business in the territory, including, without limitation, pricing, marketing, and sales strategies, product performance information, new product introduction plans, business plans, expansion plans, specialty pricing arrangements and incentives with particular customers, technology and product development research, product pipelines and release schedules, competitive responses, periodic and year-end sales data and reports, performance rankings, sales by pathology and product line, and customer or GPO-specific pricing and discounts, account and IDN-level strategy, economic value adds and financial models, standardization plans, as well as information related to DePuy Synthes' research and development plans and strategy and sensitive discussions between DePuy Synthes and DePuy Synthes' customers related to the development and rollout of new products.

43.     Majher and Spelts maintained direct responsibility, and were compensated for, product sales, and were also responsible for ensuring continuity of service and customer relationships. DePuy Synthes specifically entrusted Majher and Spelts to call on and to maintain, develop, and grow key surgeon customers with privileges at various hospitals and surgery centers. As sales consultants within these hospitals, Majher and Spelts were responsible for

cultivating relationships at these institutions and were successful, growing and maintaining a multi-million dollar business—all with DePuy Synthes' significant support and investment.

44.     Hutchings began her employment with Quintiles, providing support to DePuy Synthes as an associate sales consultant, in or around November 2016.  In this role, Hutchings provided coverage and support for sales consultants responsible for the sale of DePuy Synthes' Spine products to accounts in Southern Colorado.  Beginning in January 2017 through at least May 2017, Hutchings provided direct coverage support in the Colfax Corridor territory for Majher and Spelts as a result of their previous associate sales consultant's departure in January 2017.  Specifically, Hutchings had access to the types of trade secrets and confidential information described above and provided support at the following accounts in Majher's and Spelts's territory:  Denver Health & Hospital Authority, Musculoskeletal Surgical Center, North Suburban Medical Center, Saint Anthony's North Hospital, The Children's Hospital Association, University of Colorado Hospital, and VA Medical Center.

45.     Upon information and belief, the Sales Consultants did not have any experience in the medical device industry before their work on behalf of DePuy Synthes.  They received specialized and proprietary training in this business from DePuy Synthes, were introduced to DePuy Synthes' customers, and were permitted to utilize DePuy Synthes' financial support, resources, reputation, and confidential business information in order to fulfill their obligations to DePuy Synthes and to establish, nurture, and grown DePuy Synthes' customer relationships.

46.     The specialized training provided to the Sales Consultants included training on the technical aspects of DePuy Synthes' products and the medical procedures in which these products are used; techniques for educating operating room personnel and surgeons; and the use of new and existing implants and instrumentation, as well as information regarding DePuy

Synthes' contract and sales administration, personnel, and other departments. That training, and the additional resources DePuy Synthes provided to the Sales Consultants, ensured that they could be valuable resources on the technical aspects of DePuy Synthes' products during medical procedures and facilitated DePuy Synthes' maintenance and development of its valuable customer relationships and goodwill.

47.     As promised in their Agreements, DePuy Synthes provided the Sales Consultants with trade secrets and confidential and proprietary information throughout the course of their employment, including, without limitation, information about DePuy Synthes' customers, marketing and sales strategies, product performance information, new product introduction plans, expansion plans, specialty pricing arrangements and incentives with particular customers, technology and product development research, pipelines and release schedules, competitive responses, and other confidential and proprietary information described above. Some of this confidential information was transmitted to the Sales Consultants' personal email accounts in the days, weeks, and months preceding their resignations and, therefore, may remain in their possession today as they work to benefit SeaSpine—a direct competitor of DePuy Synthes—in violation of their Agreements.

48.     In order to capitalize on DePuy Synthes' significant investments in its trade secrets, research and development, training, and confidential information, DePuy Synthes also provided the Sales Consultants with direct access to DePuy Synthes' customer relationships and made them responsible for maintaining and developing DePuy Synthes' customer relationships and growing DePuy Synthes' business by establishing or re-establishing relationships with other customers in their assigned territories. As a result, the Sales Consultants benefitted from substantial training and received access to DePuy Synthes' customer relationships and valuable

confidential information about DePuy Synthes' customers and business activities that they would not have obtained but for their employment with DePuy Synthes and their commitment to abide by the obligations in their Agreements.

49.     To protect all of these investments as well as DePuy Synthes' customer relationships and good will, DePuy Synthes required the Sales Consultants, like other DePuy Synthes sales employees and other Quintiles employees, to enter into the Agreements as a condition of their employment with DePuy Synthes or Quintiles.

50.     Requiring sales consultants and associates sales consultants to sign contracts like the Agreement is all part of DePuy Synthes' substantial efforts to protect its trade secrets, confidential information, and the investments it makes in research and development, training, customer relationships, and goodwill, including, without limitation, obtaining patent protection when available, maintaining physical and electronic limitations or barriers to access business information, and requiring employees and third parties to maintain the confidentiality of certain business information.

### The Sales Consultants Obligations Under Their Agreements[1]

51.     In connection with and consideration of his employment with DePuy Synthes, Majher executed an Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement on or about October 14, 2014, a true and correct copy of which is attached hereto as Exhibit "A."

52.     In connection with and consideration of his employment with DePuy Synthes, Spelts executed an Employee Secrecy, Intellectual Property, Non-Competition and Non-

---

[1] Majher's, Spelts's, and Hutchings's agreements shall be collectively referred herein as the "Agreements".

Solicitation Agreement on or about February 1, 2013.  A copy of the Agreement that Spelts's signed and which is currently in DePuy Synthes' possession is attached hereto as Exhibit "B."[2]

53.     In connection with and consideration of her employment with Quintiles providing work on behalf of DePuy Synthes, Hutchings executed a Non-Disclosure, Non-Competition, and Non-Solicitation Agreement on or about October 31, 2016, a true and correct copy of which is attached hereto as Exhibit "C."[3]

54.     The Sales Consultants' Agreements confirmed that they: (1) would be given access to DePuy Synthes' confidential information (and possibly access to confidential information relating to the business of other entities with the Johnson & Johnson Family of Companies); (2) would develop, maintain, or enhance business and/or customer relationships; and/or (3) would receive training related to the company's business.  (Ex. A ¶ A; Ex. B ¶ A, Ex. C (Whereas Clause).)

55.     The Sales Consultants' Agreements contained an express definition of what constitutes "Confidential Information."  For instance, under Majher's Agreement, "Confidential Information" is defined as:

> information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to [him] or known by [him] as a result of [his] employment by the COMPANY….[which] includes, but is not limited to, (a) such things as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, finance, computer software or hardware, automated

---

[2] The Agreement signed by Spelts was electronically stored and DePuy Synthes has been unable to locate, despite its best efforts, the first page of the Agreement.  Appended to Exhibit B is a template of the DePuy Synthes' agreement that Spelts would have signed in February 2013.

[3] Quintiles' employees do not physically sign these agreements; instead there is an electronic signature of acknowledgement to memorialize their agreement to the terms therein.  A true and correct copy of the electronic confirmation demonstrating that Hutchings electronically signed her agreement is appended to Exhibit C.

systems, engineering, marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or clients, including, but not limited to, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to [him] or known by [him] in connection with [his] employment by the COMPANY including, but not limited to, performance reviews and other performance related information, organizational charts, compensation, benefits, and rankings.

(Ex. A ¶ B.)  The definitions of "Confidential Information" under the Spelts's and Hutchings's Agreements are similar.  (*See* Ex. B ¶ B, Ex. C ¶ A.)

56.  The Agreements acknowledged that the Company's Confidential Information is of great value to the Company, that the Company has legitimate business interests in protecting its Confidential Information, and that the disclosure to anyone not authorized to receive such information, including a competitor, would cause immediate irreparable injury to the Company. (*See, e.g.*, Ex. A ¶ C(5), Ex. C ¶ B(2); *see also* Ex. B ¶ C(14); Ex. B ¶A ("Because your receipt of Confidential Information will assist you in performing your work effectively and because the secrecy of Confidential Information is very important for competitive and other reasons, you are expected to preserve its confidentiality, to refrain from competing with Johnson & Johnson companies while employed by [DePuy Synthes] or any other Johnson & Johnson company, and, with certain limitations, to refrain for eighteen (18) months after your employment ends from competing with any Johnson & Johnson company whose Confidential Information you had access to during your employment.").)  As such, the Sales Consultants agreed not to "use, disclose, disseminate, lecture upon or publish any Confidential Information" during or after their employment.  Ex. A ¶ C(5), Ex. B ¶ C(5), Ex. C ¶ B(2);

57.     To formalize these protections of the Company's Confidential Information, the Sales Consultants' Agreements set forth the confidentiality obligations above as well as non-competition and non-solicitation obligations the Sales Consultants owed to DePuy Synthes.

58.     In his Agreement, Majher agreed to a non-competition obligation such that, during his employment with DePuy Synthes and for a period of eighteen (18) months after his last day of employment with DePuy Synthes, he would not:

> directly or indirectly, perform, or assist others to perform, work in [his] TERRITORY for any COMPETITOR in any position and in any location in which [he] could disadvantage [DePuy Synthes] or advantage the COMPETITOR by: (a) [his] disclosure or use of CONFIDENTIAL INFORMATION to which [he] had access; (b) [his] use of the specialized training provided to [him] by [DePuy Synthes] or any COMPANY for which [he has] worked; and/or (c) [his] use of CUSTOMER relationships and goodwill.

Ex. A at ¶ C(6).

59.     For purposes of Majher's non-competition obligation, his Agreement defines "TERRITORY" as "any geographic area: (a) to which the employee or the employee's sales team(s), if any, were assigned or had responsibility; (b) where the employee solicited sales from, made sales to, or provided services to CUSTOMERS; or (c) the geographic area where sales were made on which the employee earned commissions or other compensation, during the last eighteen (18) months of employment"; "COMPETITOR" as "any person or entity including, but not limited to, [him] or anyone acting on [his] behalf, (a) that is engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for, a product, process, technology, machine, invention, or service of any COMPANY that is in existence or under development; (b) that could benefit from: (i) CONFIDENTIAL INFORMATION; (ii) [his] use of the specialized training provided to [him]

by [DePuy Synthes] or any COMPANY; and/or (c) that could benefit from [his] use of the COMPANY's customer relationships and/or goodwill"; and "CUSTOMER" as "any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, to whom or to which [he] contacted, solicited any business from, sold to, rendered any service to, were assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last eighteen months of [his] employment with any COMPANY." Ex. A at ¶ B.

60.     In his Agreement, Spelts agreed to a non-competition obligation such that, during his employment with DePuy Synthes and for a period of eighteen (18) months after the last day of his employment with DePuy Synthes, his would not:

> directly or indirectly, perform work for any COMPETITOR in any position and in any location in which [he] could disadvantage any COMPANY or advantage the COMPETITOR by [his] disclosure or use of CONFIDENTIAL INFORMATION to which [he] had access.

Ex. B at ¶ C(6).

61.     For purposes of Spelts's non-competition obligation, his Agreement defines "COMPETITOR" as "any person or entity outside the COMPANIES (a) that is engaged in or preparing to become engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with an existing or potential product, process, technology, machine, invention, or service of any COMPANY or (b) that could benefit from CONFIDENTIAL INFORMATION". Ex. B at ¶ B.

62.    In her Agreement, Hutchings agreed to a non-competition obligation such that, while she was providing services to DePuy Synthes during her employment with Quintiles and for a period of twelve (12) months after the termination of those services, she would not:

> directly or indirectly, perform, or assist others to perform, work in [her] TERRITORY for any COMPETITOR in any position and in any location in which [she] could disadvantage DePuy Synthes or advantage the COMPETITOR by: (a) [her] disclosure or use of CONFIDENTIAL INFORMATION to which [she] had access; (b) [her] use of the specialized training provided to [her] by DePuy Synthes, and/or (c) [her] use of CUSTOMER relationships and goodwill.

Ex. C at ¶ B(3).

63.    For purposes of Hutchings's non-competition obligation, her Agreement defines "TERRITORY" as "any geographic area: (a) to which [she] were assigned or had responsibility; or (b) where [she] solicited sales from, made sales to, or provided services to CUSTOMERS, during the last eighteen (18) months of [her] provision of services to DePuy Synthes during [her] employment with Quintiles"; and "COMPETITOR" as "any person or entity including, but not limited to, [her] or anyone acting on [her] behalf, (a) that is engaged in or preparing to be engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for, a product, process, technology, machine, invention, or service of DePuy Synthes in connection with orthopedic devices that are in existence or under development; or (b) that could benefit from: (i) CONFIDENTIAL INFORMATION; (ii) [her] use of the specialized training provided to [her] by DePuy Synthes; and/or (iii) [her] use of DePuy Synthes' customer relationships and/or goodwill." Ex. C at ¶ A.

64.    The scope of the Sales Consultants' non-competition restrictions encompasses the geographic territory to which they were assigned and in which they worked collaboratively as a

team, in addition to restricting their work for a competitor, such as SeaSpine, in any other position or in any other location in which they nevertheless could disadvantage DePuy Synthes through the use or disclosure of trade secrets, confidential information, their use of their specialized training, and/or their use of DePuy Synthes' customer relationships and goodwill. That may include locations outside of their former territories and positions covering customer accounts outside of their former territories. *See* Ex. A at ¶ C(6); Ex. B at ¶ C(6); Ex. C at ¶ B(3).

65.    Majher's Agreement contains a provision prohibiting contact with and solicitation or servicing of DePuy Synthes customers during his employment with DePuy Synthes and for a period of eighteen (18) months after the last day of his employment with DePuy Synthes, wherein he agreed that he:

> shall not directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service or use of any product or service that resembles or competes with or that may be substituted for one that is being sold, under development or acquired by any COMPANY; (b) if [he] is working with, for, or as a COMPETITOR of any COMPANY; and/or (c) if [his] activities could damage or interfere with the CUSTOMER relationships of any COMPANY or divert business from such CUSTOMERS to a COMPETITOR.

Ex. A at ¶ C(7); *see also* Ex. A at ¶ B (defining "CUSTOMER" and "COMPETITOR," *supra*).

66.    Spelts's Agreement also contains a provision prohibiting solicitation or servicing of DePuy Synthes customers during his employment with DePuy Synthes and for a period of eighteen (18) months after the last day of his employment with DePuy Synthes, wherein he agreed that he will not:

> directly or indirectly, solicit any business from, sell to, or render any service to any accounts, customers or clients with which [he] ha[s] had contact during the last twelve (12) months of [his] employment within the COMPANIES in connection with the sale of any product or service that resembles or competes with one that

> is being (or is being prepared to be) sold, developed or acquired by any COMPANY for which [he] worked during the last twelve (12) months of [his] employment.

Ex. B at ¶ C(7).

67.     Hutchings's Agreement similarly contains a provision prohibiting contact with and solicitation or servicing of DePuy Synthes customers while she is providing services to DePuy Synthes during her employment with Quintiles and for a period of twelve (12) months after the termination of those services, wherein she agreed that she:

> shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service or use of any product or service that resembles or competes with or that may be substituted for one that is being sold, under development or acquired by DePuy Synthes in connection with orthopedic devices; (b) if [she is] working with, for, or as a COMPETITOR of DePuy Synthes; and/or (c) if [her] activities could damage or interfere with the CUSTOMER relationships of DePuy Synthes or divert business from such CUSTOMERS to a COMPETITOR.

Ex. C at ¶ B(4); *see also* Ex. C at ¶ A (defining "CUSTOMER" and "COMPETITOR," *supra*).

68.     Majher's Agreement also restricts any disloyal, competitive, and potentially harmful activity or interference with DePuy Synthes' customer or employee relationships during his employment with DePuy Synthes, specifically defining the scope of his fiduciary obligations to DePuy Synthes:

> During [his] employment, while you may investigate other employment or business opportunities, [he] acknowledge[s] and agree[s] that [he is] subject to a duty of loyalty. Therefore, [he] agree[s] that during [his] employment, [he] will not, directly or indirectly, among other things, compete against the COMPANY; do anything to impair [DePuy Synthes'] business or relationships with its CUSTOMERS; inform CUSTOMERS that [he is] terminating [his] employment and starting a competing business or

> going to work for a COMPETITOR; contact a CUSTOMER on behalf of a COMPETITOR; recommend a COMPETITOR or a COMPETITOR's products or services; engage in training on or assist in selling or promoting a COMPETITOR'S products or services; engage in recruitment or solicitation of other employees of [his] EMPLOYER or any COMPANY to join a COMPETITOR.

Ex. A at ¶ C(21); *see also* Ex. A at ¶ B (defining "CUSTOMER(S)" and "COMPETITOR," *supra*).

69.     Spelts's and Hutchings's Agreement provided that their Agreements did not limit or otherwise affect any common law duties they had to DePuy Synthes and/or Quintiles, including, but not limited to, their duties of loyalty.  *See* Ex. B at ¶ C(16); Ex. C at ¶ B(13).

70.     Buttressing Majher's and Spelts's fiduciary duties to DePuy Synthes and DePuy Synthes' ability to transition the servicing of accounts and patient care and to monitor and ensure compliance with contractual obligations under the Agreements, Majher's and Spelts's Agreements require a two-week notice and transition period to which Majher and Spelts's expressly agreed.  *See* Ex. A at ¶ C(10); Ex. B at ¶ C(9).  For instance, Majher's Agreement provides as follows:

> For purposes of enabling [DePuy Synthes] and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify [DePuy Synthes] in writing, at least two weeks before your last date of employment with [DePuy Synthes], and provide at least two weeks advance written notice whenever within the eighteen (18)-month period following the termination of employment you plan to commence work with a new entity or person of: your start date, the identity of each entity or person for which you will be working, your new title, and the responsibilities of the position (such as the products and/or services you will be working on for the new entity or person, and any territory you may cover). During this time period you will also provide such notice regarding any planned or actual changes in your work responsibilities. You will provide the notices required under this Paragraph to the highest-ranking employee in the Human Resources organization of [DePuy Synthes] and will do so promptly, and, in any event, at least two (2) weeks prior to

> commencing any new position or (if applicable) any new responsibilities. You will promptly provide any additional information requested by [DePuy Synthes] to determine compliance with your obligations under this Agreement. The information you provide pursuant to this Paragraph should not include any confidential information belonging to anyone outside the COMPANY and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

Ex. A at ¶ C(10).

71.     In their Agreements, Majher and Hutchings agreed that DePuy Synthes has a legitimate interest in protecting its CONFIDENTIAL INFORMATION, its customer relationships and the goodwill associated with such customer relationships, and the provision of its specialized training.  *See* Ex. A at ¶ C(13); Ex. C at ¶ B(8).  They also agreed that the restrictive covenants in the Agreements are reasonably necessary to ensure that DePuy Synthes is able to protect its legitimate interests and that they would not dispute their reasonableness".  *See id*.  Similar to the restrictive covenants in Majher's and Hutchings's Agreements, the restrictive covenants in Spelts's Agreement are also reasonably necessary to protect DePuy Synthes' legitimate interests.  *See* Ex. B at ¶ C(6)-(7).

72.     Majher and Hutchings also recognized that their obligations under the Agreements apply to any position that they may hold as an employee of DePuy Synthes or Quintiles or to any services they provide to DePuy Synthes and shall continue in effect in the event of a promotion, demotion, retention, or in a new position, or any other change in the circumstances of their employment, including without limitation any change in the scope or nature of their responsibilities or assignment, their level or seniority, or their compensation or benefits.  *See* Ex. A at ¶ C(18); Ex. C at ¶ B(10).

73.     Majher and Hutchings further agreed that if they were to breach any provision of the Agreements, "the duration of any applicable restrictive covenant shall commence from the date injunctive relief is granted or from the date that you cease such conduct that violates the restrictive covenant and shall be extended for an amount of time equivalent to any period of breach." *See* Ex. A at ¶ C(14); Ex. C at ¶ B(9).

74.     The Sales Consultants' Agreements are governed by New Jersey law, consistent with DePuy Synthes' need to protect its legitimate business interests and its nationwide operations with a uniform, national standard. *See* Ex. A at ¶ C(22); Ex. B at ¶ C(17); Ex. C at ¶ B(14).

75.     Finally, Hutchings's Agreement makes clear that DePuy Synthes, and its successors and assigns, are express third-party beneficiaries of her Agreement, and, as such, may enforce the Agreement directly as if DePuy Synthes were a signatory. *See* Ex. C at ¶ B(12).

**The Sales Consultants' Coordinated Resignations and Breaches of Their Agreements**

76.     On September 5, 2017, Hutchings informed her DePuy Synthes' Regional Manager in the Rocky Mountain Region, Dana Grinnell, that she was planning to resign to accept a clinical specialist position at SeaSpine, a direct competitor of DePuy Synthes.  A few days later, on September 8, 2017, Hutchings submitted her formal resignation to Quintiles. Hutchings did not provide any notice to Quintiles or otherwise agree to transition her responsibilities.  Her resignation was effective immediately.

77.     Before Hutchings officially resigned, Majher and Spelts met with Ms. Grinnell on September 6, 2017 and informed her that they were resigning from DePuy Synthes together to join a competitive spine company and that they had multiple offers but had not yet decided where they were going.  Neither Majher nor Spelts provided two weeks' notice of their resignation and they did not provide DePuy Synthes with the contractually-required specifics of

their post-employment plans, other than a vague description of their next move to an unnamed competitive spine company.  They did not provide their start date, the identity of any entity or person for which they would be working, their new titles, or the responsibilities of their new positions, for example, the products and/or services they would be working on as well as any territory they would be responsible for.

78.     In the days, weeks, and months leading up to their coordinated resignations, the Sales Consultants emailed highly confidential, proprietary, and trade secret information to their personal email accounts, including, without limitation, specific pricing information for customers in their territory, purchasing information, regional business strategies, as well as detailed sales data for the Colfax Corridor territory.  The Sales Consultants have failed to return this information to DePuy Synthes, in direct violation of their express obligation to do so under their Agreements.

79.     Consistent with their obligations under the Agreements with DePuy Synthes, Ms. Grinnell advised Majher and Spelts to provide written notice of their resignations.  Further, Ms. Grinnell specifically instructed Majher and Spelts not further contact their accounts in the Colfax Corridor territory before their departure from DePuy Synthes.

80.     Despite their obligations to DePuy Synthes, and upon information and belief, Majher and Spelts ignored these instructions and contacted their DePuy Synthes customers while they were still employed by DePuy Synthes to inform their customers of their resignations from DePuy Synthes.

81.     Majher and Spelts ultimately submitted their coordinated written resignations to DePuy Synthes wherein they stated that they were starting a distributorship in Colorado and surrounding states.  They did not provide any additional detail in their written resignations.

82.     Upon information and belief, SeaSpine was aware of the Sales Consultants' contractual notice and transition obligations and interfered with the Sales Consultants' compliance with those obligations.

83.     Hutchings is now working for SeaSpine as a direct employee with responsibility for the same accounts and customers that she provided case coverage and support for during the time she was providing services to DePuy Synthes.  Specifically, since resigning, Hutchings has been working for SeaSpine in accounts that she covered as an associate sales consultant in the Colfax Corridor territory—accounts that she provided direct case coverage support for during the five-month period (January through May 2017) when there was no associate sales consultant available in Majher's and Spelts's territory.

84.     Hutchings has covered cases with at least two surgeons at the University of Colorado Hospital and VA Medical Center—accounts that were in the Colfax Corridor territory and about which she has confidential information.  Hutchings has also attended numerous x-ray conferences at the University of Colorado Hospital and has had a meeting with at least one other surgeon with whom she provided case coverage and support on behalf of DePuy Synthes.

85.     Since their departure from DePuy Synthes, Majher and Spelts have formed an independent distributorship distributing or intending to distribute, at minimum, SeaSpine products.  Upon information and belief, Majher and Spelts had been considering forming a distributorship since as early as April 2017 and took affirmative steps to form the distributorship during their employment with DePuy Synthes.

86.     Since their departure from DePuy Synthes, Majher and Spelts have been in contact with former customers in their Colfax Corridor territory—including customers that Hutchings has had contact with and/or covered surgical cases for and, upon information and

belief, customers that Hutchings has converted and/or is in the process of converting to SeaSpine. For instance, since their coordinated departures from DePuy Synthes, Majher has been observed at a dinner and a bike race with former surgeons that Hutchings has converted and/or is in the process of converting and Spelts has had a meeting with a former surgeon that Hutchings has successfully converted to SeaSpine. Further, both Majher and Spelts have attended an x-ray conference with at least one former surgeon that Hutchings has converted and/or is in the process of converting to SeaSpine.

87.     Furthermore, upon information and belief, Spelts is currently in possession of custom instrumentation belonging to DePuy Synthes that was developed by DePuy Synthes for use by a surgeon in the Colfax Corridor territory for whom Spelts had responsibility during his employment with DePuy Synthes.

88.     It is highly unlikely that Hutchings, as an associate sales consultant, would have been able to immediately convert DePuy Synthes' business in the Colfax Corridor territory without assistance from Majher and Spelts. Indeed, this immediate conversion of business from DePuy Synthes to SeaSpine would have required advanced coordination and planning. Accordingly, upon information and belief, since their resignations from DePuy Synthes, Majher and Spelts have worked behind the scenes to facilitate the conversion of business in the Colfax Corridor territory from DePuy Synthes to SeaSpine. As a result of their unlawful activities, Defendants have already begun to succeed in converting DePuy Synthes' business to SeaSpine.

89.     The responsible decision-makers at SeaSpine, and the Sales Consultants themselves, were well aware of the contractual obligations that the Sales Consultants each owed to DePuy Synthes.

90.     The almost immediate conversion of business following their coordinated resignations from DePuy Synthes confirms not only Defendants' intent to disregard and interfere with the Sales Consultants' contractual obligations going forward but also that the unlawful competitive activities undertaken to date have already borne fruit.

91.     Based upon the coordinated nature and timing of their resignations, their failure to provide two weeks' notice or transition responsibilities, Majher's and Spelt's violation of their manager's directive not to contact their customers before their departure, and the loss of business in the aftermath of their resignations, there was, upon information and belief, coordination among Defendants to effect Hutchings's employment with SeaSpine and the conversion of business from DePuy Synthes to SeaSpine.

92.     Upon information and belief, as a result of these activities, the Sales Consultants have already successfully solicited DePuy Synthes' customers in violation of their obligations to DePuy Synthes.  Defendants will continue to benefit from those unlawful solicitations and will continue to inflict substantial, and irreparable, harm on DePuy Synthes, including through ongoing violations of the Agreements, unless restrained.

## COUNT I
## BREACH OF FIDUCIARY DUTY AND/OR DUTY OF LOYALTY
### (Against the Sales Consultants)

93.     DePuy Synthes incorporates and re-alleges every allegation set forth above, which further detail the Defendants' conduct as though fully set forth herein.

94.     During the term of their employment with DePuy Synthes, the Sales Consultants each owed DePuy Synthes a duty of the utmost good faith, undivided loyalty, diligence, and faithful service and a duty to place DePuy Synthes' interests ahead of their own and not to act for persons, entities, or purposes whose interests would conflict with those of DePuy Synthes.

95.     Disregarding those duties and while being compensated by DePuy Synthes, the Sales Consultants diverted their efforts during their time as DePuy Synthes employees in order to facilitate their ongoing competition with DePuy Synthes after their resignation.

96.     Upon information and belief, the Sales Consultants breached their fiduciary duties to DePuy Synthes by exploiting their access to DePuy Synthes' computers and systems during the period of time they were coordinating their departures by sending highly confidential, proprietary, and trade secret information belonging to DePuy Synthes to their personal email accounts in the days, weeks, and months leading to their coordinated resignations, including, without limitation, specific pricing information for customers in their territory, purchasing information, regional business strategies, as well as detailed sales data for the Colfax Corridor territory.  The Sales Consultants have failed to return this information to DePuy Synthes, which remains in their possession today.

97.     Upon information and belief, the Sales Consultants breached their fiduciary duties by usurping customer relationships belonging to DePuy Synthes to benefit SeaSpine and/or themselves by, among other things, informing their DePuy Synthes customers prior to their resignation that they would be leaving the employ of DePuy Synthes.

98.     Upon information and belief, the Sales Consultants breached their fiduciary duties by soliciting each other to resign from DePuy Synthes to join or otherwise become affiliated with SeaSpine, where they would participate in an unlawful scheme to solicit DePuy Synthes customers and convert business from DePuy Synthes to SeaSpine.

99.     The Sales Consultants were bound to act in good faith and with due regard to the interests of DePuy Synthes while employees of DePuy Synthes, but instead acted for their own

interests and to injure DePuy Synthes in its business, and they have been unjustly enriched through their unlawful conduct.

100.    DePuy Synthes has suffered, and will continue to suffer, substantial and irreparable harm as a result of the Sales Consultants' tortious conduct.

101.    The Sales Consultants' tortious conduct is a direct and proximate cause of DePuy Synthes' damages.

**WHEREFORE**, DePuy Synthes demands judgment in its favor and against the Defendants, and respectfully requests the following relief:

a.    Actual damages that DePuy Synthes is entitled to recover as a result of the Sales Consultants' breaches of fiduciary duty;

b.    Incidental and consequential damages as permitted by law;

c.    The establishment of a constructive trust in favor of DePuy Synthes;

d.    Damages or disgorgement in the amount that the Defendants have been unjustly enriched as a result of the Sales Consultants' tortious conduct;

e.    Recoupment of compensation paid to the Sales Consultants during the breach of their fiduciary duties to DePuy Synthes;

f.    Injunctive relief;

g.    An equitable accounting, disgorgement, forfeiture, and delivery to DePuy Synthes of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from the Sales Consultants' tortious conduct or from their possession or use of DePuy Synthes' resources;

h.    An equitable accounting, forfeiture, forensic analysis, and return of all DePuy Synthes' information, property, and product in the Defendants' possession, custody, or control;

i.    DePuy Synthes' attorney's fees and costs;

j.    Interest; and

k.    All such other relief as this Court deems appropriate.

## COUNT II
## BREACH OF CONTRACT
### (Against the Sales Consultants)

102.     DePuy Synthes incorporates and re-alleges every allegation set forth above, which further detail the Defendants' conduct as though fully set forth herein.

103.     The Sales Consultants' Agreements are valid and enforceable agreements, are each supported by adequate consideration and are expressly designed to protect DePuy Synthes' confidential, proprietary, and trade secret information.

104.     The Agreements prohibit the Sales Consultants from, among other things, as set forth above and in the Agreements, directly and/or indirectly soliciting DePuy Synthes' customers; disclosing or using DePuy Synthes' confidential, proprietary, and trade secret information; and otherwise competing with DePuy Synthes in their former territories.

105.     Further, Majher's and Spelts's Agreements require that they provide DePuy Synthes with two weeks' written notice of their resignations as well as information concerning their post-termination plans that would allow DePuy Synthes to effectively transition the Sales Consultants' responsibilities and to ensure compliance with their agreements.

106.     The Sale Consultants have breached, and threaten to continue to breach, their Agreements.

107.     Despite their contractual obligation to do so, Majher and Spelts collectively resigned from DePuy Synthes (along with Hutchings), effective immediately, without providing DePuy Synthes two weeks' notice of their resignations or any specific information concerning their post-employment plans, in direct violation of their Agreements.

108.     Further, despite being specifically instructed not to further contact their former accounts before their departure, and upon information and belief, Majher and Spelts contacted

their DePuy Synthes customers while they were still employed by DePuy Synthes to inform their customers of their resignations from DePuy Synthes.

109.    Upon information and belief, the Sales Consultants intend to, and have already begun to—directly and/or indirectly by providing assistance to one another—solicit and service customers from their assigned DePuy Synthes territories and for whom they had direct and indirect responsibility during the last eighteen (18) months of their employment with DePuy Synthes and/or Quintiles, including by working through each other to do that which the Agreements prohibit each of them from doing directly and, in the case of Hutchings, by directly soliciting and servicing customers for whom she provided coverage during the time she was providing services to DePuy Synthes in connection with her employment with Quintiles.

110.    Since resigning, Hutchings has been working for SeaSpine in a geographic territory where she provided direct coverage and support services on behalf of DePuy Synthes during the last eighteen months of her provision of services to DePuy Synthes during her employment with Quintiles, in direct violation of non-competition restrictions in her Agreement. She is also in violation of the non-competition restrictions in the Agreements because she is employed by SeaSpine in positions and in locations in which she can directly and indirectly harm DePuy Synthes' by the use or disclosure of DePuy Synthes' Confidential Information, the use of their specialized training, and the use of DePuy Synthes' customer relationships and goodwill.

111.    In this capacity, Hutchings is soliciting and/or attempting to solicit DePuy Synthes customers with whom she has had contact with, rendered services to, and/or was assigned to during the last eighteen months of her provision of services to DePuy Synthes during her employment with Quintiles, in direct violation of the non-solicitation restrictions in her Agreement.

112.    Further, Majher and Spelts have been in contact with former customers in their Colfax Corridor territory, including the same customers that, upon information and belief, Hutchings has converted and/or is in the process of converting to SeaSpine.

113.    Upon information and belief, since their resignations from DePuy Synthes, Majher and Spelts have surreptitiously worked behind the scenes to assist Hutchings in converting cases with their former customers in the Colfax Corridor territory from DePuy Synthes to SeaSpine, in violation of their Agreements with DePuy Synthes.

114.    As a result of their unlawful activities, the Sales Consultants have already begun to succeed in converting DePuy Synthes' business to SeaSpine.

115.    Upon information and belief, the Sales Consultants have used and/or inevitably will use or continue to use DePuy Synthes' confidential information in the course of their unlawful competition with DePuy Synthes in violation of the Agreements.  Indeed, in the days, weeks, and months leading to their coordinated resignations, the Sales Consultants emailed highly confidential, proprietary, and trade secret information belonging to DePuy Synthes to their personal email accounts, including, without limitation, specific pricing information for customers in their territory, purchasing information, regional business strategies, as well as detailed sales data for the Colfax Corridor territory.  The Sales Consultants have failed to return this information to DePuy Synthes, in direct violation of their express obligation to do so under their Agreements.

116.    Upon information and belief, the Sales Consultants have disclosed and/or inevitably will disclose DePuy Synthes' confidential information in the course of their unlawful competition with DePuy Synthes in violation of the Agreements.

117.    Upon information and belief, the Sales Consultants have used and/or inevitably will use DePuy Synthes' customer relationships and/or goodwill in the course of their unlawful competition with DePuy Synthes in violation of the Agreements.

118.    The Sales Consultants' actual and/or prospective breaches of the Agreements have caused, and will continue to cause, immediate and irreparable harm to DePuy Synthes.

119.    DePuy Synthes has no adequate remedy at law to fully compensate them for the harm caused by the Sales Consultants' unlawful conduct and will continue to suffer substantial and immediate irreparable harm unless they are restrained.

**WHEREFORE**, DePuy Synthes demands judgment in its favor and against the Sale Consultants, and respectfully requests the following relief:

a.    Enforcement of the Agreements;

b.    Interim and permanent injunctive relief prohibiting the Sale Consultants from violating the terms of their Agreements;

c.    Actual damages that DePuy Synthes is entitled to recover as a result of the Sales Consultants' breaches of the Agreements;

d.    Incidental and consequential damages as permitted by law;

e.    The establishment of a constructive trust in favor of DePuy Synthes;

f.    Damages or disgorgement in the amount that the Sales Consultants have been unjustly enriched as a result of their breaches of the Agreements;

g.    An equitable accounting, disgorgement, forfeiture, and delivery to DePuy Synthes of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from the Sales Consultants' breaches of the Agreements or from their possession or use of DePuy Synthes' resources;

h.    An equitable accounting, forfeiture, forensic analysis, and return of all DePuy Synthes' information, property, and product in the Sales Consultants' possession, custody, or control;

i.    DePuy Synthes' attorney's fees and costs;

j.    Interest; and

k.      All such other relief as this Court deems appropriate.

**COUNT III**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against the Defendants)**

120.    DePuy Synthes incorporates and re-alleges every allegation set forth above, which further detail Defendants' conduct, as though fully set forth herein.

121.    In addition, or in the alternative, Defendants have tortiously interfered with DePuy Synthes' contractual relationships with each of the Sales Consultants.

122.    At the time that the Sales Consultants were working together on their coordinated resignations, DePuy Synthes had existing contractual relationships with the Sales Consultants (*see* Exs. A-C), and each of the Defendants knew or should have known about those contractual relationships.

123.    At the time Hutchings began working for SeaSpine, and at the time Majher and Spelts began surreptitiously assisting Hutchings behind the scenes in connection with her work for SeaSpine, DePuy Synthes had contractual relationships with the Sales Consultants (*see* Exs. A-C), and each of the Defendants knew or should have known about those relationships.

124.    The Defendants have tortiously interfered with DePuy Synthes' contractual relationships with each of the Sales Consultants by encouraging and causing the Sales Consultants to breach their contractual obligations to DePuy Synthes.

125.    Throughout all of their tortious conduct, the Defendants have acted without privilege or justification in interfering with DePuy Synthes' relationships with each of the Sales Consultants.

126.    The Defendants' interference with DePuy Synthes' relationships with each of the Sales Consultants was willful and wanton and has been carried out with a specific intent to injure DePuy Synthes in the conduct of its business.

127.    DePuy Synthes has suffered, and will continue to suffer, substantial and irreparable damage as a result of the Defendants' tortious conduct.

WHEREFORE, DePuy Synthes demands judgment in its favor and against Defendants, and respectfully requests the following relief:

a.    Actual damages that DePuy Synthes is entitled to recover as a result of the Defendants' tortious interference;

b.    Incidental and consequential damages as permitted by law;

c.    For punitive damages to punish Defendants for their willful and malicious conduct in tortiously interfering with DePuy Synthes' contractual relationships;

d.    The establishment of a constructive trust in favor of DePuy Synthes;

e.    Damages or disgorgement in the amount that Defendants have been unjustly enriched as a result of their tortious conduct;

f.    An equitable accounting, disgorgement, forfeiture, and delivery to DePuy Synthes of all assets, income, profits, pecuniary benefits, and all illicitly obtained gains or profits resulting from Defendants' tortious conduct;

g.    An equitable accounting, forfeiture, forensic analysis, and return of all DePuy Synthes' information, property, and product in Defendants' possession, custody, or control;

h.    Injunctive relief;

i.    DePuy Synthes' attorney's fees and costs;

j.    Interest; and

k.    All such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## <u>VERIFICATION</u>

I, Dana Grinnell, in my capacity as Regional Sales Manager of the Rocky Mountain Region in DePuy Synthes' Spine division, hereby state that I am familiar with the facts set forth in the foregoing Verified Complaint, am authorized to execute this Verification on behalf of Plaintiff DePuy Synthes Sales, Inc., and that the facts set forth therein are true and correct to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of 28 U.S.C. § 1746 for unsworn falsification to authorities.

Dana Grinnell

Digitally signed by Dana Grinnell
DN: cn=Dana Grinnell, o, ou,
email=dgrinne1@its.jnj.com, c=US
Reason: I attest to the accuracy and integrity of this document.
Date: 2018.02.01 18:17:47 -07'00'
Adobe Reader version: 11.0.10

_____
Dana Grinnell

Dated: February 1, 2018

Respectfully submitted this 1st day of February, 2018

*/s/ Kristi L. Blumhardt*

Kristi L. Blumhardt
McElroy, Deutsch, Mulvaney & Carpenter, LLP
5600 South Quebec Street, Suite C100
P.O. Box 4467
Englewood, CO  80155-4467
Telephone:      (303) 293-8800
Facsimile:      (303) 839-0036
E-Mail:         kblumhardt@mdmc-law.com

**BLANK ROME**
Anthony B. Haller
Leigh Ann Buziak
One Logan Square
130 North 18th Street
Philadelphia, PA  19103-6998
Telephone:      (215) 569-5690/5386/5369
Facsimile:      (215) 832-5690/5386/5369
E-Mail:         Haller@BlankRome.com
                Buziak@BlankRome.com

*Attorneys for Plaintiff DePuy Synthes Sales, Inc.*

**Plaintiff's address:**
DePuy Synthes Sales, Inc.
325 Paramount Drive,
Raynham, MA  02767